700 S.E.2d 518

**MYLAN LABORATORIES INC., Mylan Pharmaceuticals Inc. and UDL Laboratories Inc., Plaintiffs Below, Appellants,**

v.

**AMERICAN MOTORISTS INSURANCE CO., Continental Insurance Co., Wausau Insurance Co. and Great American Insurance Co., Defendants Below, Appellees.**

No. 34402.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 2, 2009.

Decided June 18, 2010.

Charles J. Crooks, Esq., Jackson Kelly PLLC, Morgantown, WV, and David A. Gauntlett, Esq., Pro hac vice, James A. Lowe, Esq., Pro hac vice, Gauntlett & Associates, Irvine, CA, for Appellants.

Marc E. Williams, Esq., J. David Bolen, Esq., Robert Edward Ryan, Esq., Huddleston Bolen LLP, Huntington, WV, for Appellees, American Motorists Insurance Company and Wausau Insurance Company.

Ronald A. Rispo, Esq., Pro hac vice, Randy L. Taylor, Esq., Pro hac vice, Weston

Hurd LLC, Cleveland, OH, for Appellee, Wausau Insurance Company.

Robert B. Allen, Esq., Pamela C. Deem, Esq., Allen Guthrie & Thomas, PLLC, Charleston, WV, and Charles T. Blair, Esq., Pro hac vice, Troutman & Sanders, Washington, D.C., for Appellee, Continental Insurance Company.

Thomas V. Flaherty, Esq., Flaherty, Sensabaugh & Bonasso, Charleston, WV, and Todd S. Schenk, Esq., Pro hac vice, Marcos G. Cancio, Esq., Pro hac vice, Amber Coisman, Esq., Pro Hac Vice, Tressler, Soderstrom, Maloney & Priess LLP, Chicago, IL, for Federal Insurance Company.

PER CURIAM:

The appellants herein, Mylan Laboratories Inc., Mylan Pharmaceuticals Inc., and UDL Laboratories Inc. (hereinafter collectively referred to as "Mylan"), appeal the February 8, 2007 order of the Circuit Court of Monongalia County that held that the appellee insurance companies, American Motorists Insurance Co., Continental Insurance Co., Wausau Insurance Co., and Federal Insurance Co., have no duty to defend Mylan in certain civil actions brought against it. After careful consideration of the record, the parties' arguments, and the applicable law, this Court affirms the circuit court's order.

## I.

## FACTS

Mylan, a manufacturer of generic drugs, was named a defendant in lawsuits brought in several states. These lawsuits can be divided into two classes: average wholesale price litigation (hereinafter referred to as "AWP" litigation), and Lorazepam and Clorazepate litigation (hereinafter referred to as "L & C" litigation).

The AWP litigation relates to the average wholesale price of prescription drugs manufactured, marketed, and sold by Mylan. Basically, physicians and other providers of drugs are reimbursed by Medicare and other third-party payors based on the average wholesale price of the drug. Manufacturers periodically report the average wholesale price of drugs to publishers who list the prices as reported to them by the manufacturers.

The AWP litigation alleges that Mylan and others engaged in a scheme to fraudulently manipulate the average wholesale price of its drugs. As part of this scheme, Mylan reported inflated average wholesale drug prices which materially misrepresented the actual prices paid to Mylan for prescription drugs by drug providers such as hospitals, pharmacies, and physicians. As a result, drug providers were reimbursed significantly more money than they actually paid for Mylan-manufactured drugs. Moreover, Mylan used this scheme as a marketing ploy. Specifically, Mylan advertised the difference or "spread" in prices as a reason why those in the distribution chain should sell its drugs, a practice known as "marketing the spread." In this way, Mylan increased its share of the generic drug market.

The plaintiffs in the AWP cases are patients who were prescribed Mylan-manufactured drugs, third-party payors, states, and counties responsible for reimbursing drug providers based on the reported average wholesale price of Mylan-manufactured drugs.[1] As of the date of the oral argument

---

1. An example of the allegations in the AWP litigation is found in a complaint filed against Mylan and others by the State of Illinois. Specifically, the complaint alleged, in pertinent part:
   First, defendants sell their drugs in a unique manner which hides the true price of their drugs. This scheme works as follows. Upon agreeing on a quantity and price of a drug with a provider, or group of providers, the defendants purport to sell the agreed-upon drugs to wholesalers with whom they have a contractual arrangement, at the WAC [wholesale acquisition cost] price. The WAC may be, and usually is, higher than the price agreed upon by

the provider and the drug manufacturer. The wholesaler then ships the product to the provider, charging the provider the (lower) price originally agreed upon by the drug manufacturers and the provider. When the wholesaler receives payment from the provider, it charges the manufacturers the price for handling and any applicable rebates and discounts, and sends a bill to the manufacturer, called a "charge-back," for the difference between the WAC and the price actually paid by the provider. These charge-backs (or shelf adjustments, or other economic inducements) are kept secret, so that it appears that the wholesaler

of this case before this Court, the AWP litigation was pending.

The second class of lawsuits in which Mylan was involved was the L & C litigation. These lawsuits originally were brought by the Federal Trade Commission based on alleged antitrust violations of Section 5(a) of the Federal Trade Commission Act. This litigation alleges that Mylan acquired an exclusive licensing agreement with the company which supplied the active pharmaceutical ingredients for two generic drugs manufactured by Mylan: Lorazepam and Clorazepate. The exclusive agreements prohibited the suppliers from selling these active pharmaceutical ingredients to any other generic drug manufacturer for a period of 10 years. Despite no significant increase in costs, the price charged by Mylan for Lorazepam and Clorazepate increased dramatically. Depending upon the size of the bottle, the price for Clorazepate increased by amounts ranging from 1,900 percent to 3,200 percent.[2] The price for Lorazepam tablets increased 1,900 percent to 2,600 percent.[3]

The Federal Trade Commission litigation alleged eight causes of action against Mylan: (1) agreement in restraint of trade on Lorazepam; (2) agreement in restraint of trade on Clorazepate; (3) conspiracy to monopolize generic Lorazepam tablets market; (4) conspiracy to monopolize generic Clorazepate tablets market; (5) monopolization of generic Lorazepam tablets market; (6) attempted monopolization of generic Lorazepam tablets market; (7) monopolization of generic Clorazepate tablets market; and (8) attempted monopolization of generic Clorazepate tablets market. The original Federal Trade Commission complaint alleged in part that,

> As a result of these substantial and unprecedented price increases for lorazepam and clorazepate tablets, many purchasers, including pharmacies, hospitals, insurers, managed care organizations, wholesalers, government agencies, and others, have paid substantially higher prices. Moreover, some patients have stopped taking lorazepam and clorazepate tablets altogether, or been forced to reduce the quantity they take, because they can not afford them.

Subsequently, thirty-two states jointly filed suit against Mylan and other defendants in a suite alleging violations of each state's antitrust laws. Several third-party payors filed similar actions against Mylan. A global settlement was reached in most of these cases wherein Mylan agreed to pay over $135 million. Two groups of plaintiffs opted out of the settlement and a verdict was rendered against Mylan in the amount of $12 million.

The appellees herein are four insurance companies from whom Mylan purchased insurance polices. Specifically, American Motorists Insurance Company issued two policies to Mylan which were characterized by the circuit court as general liability policies with limits of $1 million.[4] Continental Insurance Company issued two insurance policies to Mylan which were characterized by the circuit court as general liability policies with limits of $1 million.[5] Wausau Insurance

---

actually purchased the drug at the higher WAC price. The effect of this practice is to create the impression that the "wholesale price" of the drug is higher than it really is.

Second, defendants further inhibit the ability of Illinois and other ultimate purchasers to learn the true cost of their drugs by insisting upon confidentiality provisions in their sales agreements with providers, terming them trade secrets and proprietary, to preclude providers from disclosing to others the prices they paid. Third, defendants further obscure the true prices for their drugs with their policy of treating different purchasers differently. Thus, for the same drug, pharmacies are given one price, hospitals another, and doctors yet another.

Fourth, at least some defendants have hidden their real drug prices by providing free drugs and phony grants to providers as a means of discounting the overall price of their drugs[.]

2. The price for a 500–count bottle of 7.5 mg clorazepate went from $11.66 to $377.00.

3. The price for a 500–count bottle of 1 mg lorazepam increased from $7.30 to $191.00

4. These two policies were Policy Number 3YM 851 972–01, effective dates July 1, 1991, to July 1, 1992, and Policy Number 3YM 851 972–02, effective dates July 1, 1992, to September 1, 1993.

5. These were Policy Number 15CBP06156061–94, effective dates September 1, 1993, to September 1, 1994, and Policy Number

Company issued six policies to Mylan which were characterized by the circuit court as general liability policies of $1 million.[6] Finally, Federal Insurance Company issued an insurance policy to Mylan which the circuit court characterized as an umbrella policy with limits of liability of $10 million in excess of $1 million during the policy term of September 1, 1997 to September 1, 1998, with the policy limits on the later issued policy of $20 million in excess of $1 million.[7]

The appellee insurance companies filed a declaratory judgment action in the Circuit Court of Monongalia County seeking a determination whether they have a duty to defend Mylan in the above-described litigation. Both Mylan and the appellees filed motions for summary judgment. By order dated February 8, 2007, the circuit court granted the appellees' motions for summary judgment and denied Mylan's motions for summary judgment. Mylan now appeals this order.

## II.

### STANDARD OF REVIEW

■ The circuit court's order on appeal is a grant of summary judgment in a declaratory judgment. Also, the circuit court's order is based on its construction of the language in certain insurance policies. Therefore, this Court's standard of review in this case is *de novo*. *See* Syllabus Point 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995) (holding that "[a] circuit court's entry of a declaratory judgment is reviewed *de novo*."); Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451

15CBP06156061–95, effective dates September 1, 1994, to September 1, 1995.

6. These were Policy Number 0526–00–101388, effective dates September 1, 1995, to September 1, 1996; Policy Number 0527–11–101388, effective dates September 1, 1996, to September 1, 1997; Policy Number 0528–00–101388, effective dates September 1, 1997, to September 1, 1998; Policy Number 0529–00–101388, effective dates September 1, 1998, to September 1, 1999; Policy Number 0520–00–101388, effective dates September 1, 1999, to September 1, 2000; Policy Number 0521–00–101388, effective dates September 1, 2000, to September 1, 2001.

7. This is Policy Number 7966–70–27 with effective dates of September 1, 1997, to September 1,

S.E.2d 755 (1994) (holding that "[a] circuit court's entry of summary judgment is reviewed *de novo*."); Syllabus Point 2, *Riffe v. Home Finders Associates, Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999) (holding that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgment, shall be reviewed *de novo* on appeal.").

## III.

### DISCUSSION

1. *American Motorists', Continental's, and Wausau's Duty to Defend for an "Advertising Injury" in the AWP Litigation*

In its February 8, 2007 order that granted summary judgment to the appellees, the circuit court first found that the underlying actions in the AWP litigation do not allege an advertising injury or the use of another's advertising idea as defined in the American Motorists, Continental, and Wausau policies. Thus, no coverage is triggered by the policies at issue and the appellees have no duty to defend Mylan in these actions.

The American Motorists, Continental, and Wausau policies all provide that they will defend suits alleging an "Advertising Injury." The American Motorists and Continental Policies define "Advertising Injury" to include injury arising out of the "misappropriation of advertising ideas or style of doing business."[8] Wausau policy numbers 0526–

1998; September 1, 1998, to September 1, 1999, to September 1, 2000; and September 1, 2001.

8. The American Motorists and Continental polices at issue provide, in relevant part, as follows:

> b. This insurance applies to:
> (1) ...
> (2) "Advertising Injury" caused by an offense committed in the course of advertising your goods, products or services;
> but only if the offense was committed in the "coverage territory" during the policy period.
> * * *
> "Advertising injury" means injury arising out of one or more of the following offenses:
> a. Oral or written publication of material that slanders or libels a person or organization or

00–101388 through 0520–00–101388 define "Advertising Injury" to include injury arising out of the "misappropriation of advertising ideas."[9] Wausau policy number 0521–00–101388 defines "Advertising Injury" to include injury arising out of "use of another's advertising idea in your advertisement."[10]

In its summary judgment order, the circuit court determined, *inter alia,* that in order to trigger the duty to defend, the plaintiff's allegations of misappropriation have to involve the wrongful taking of the advertising idea or style of doing business of another. Upon examining the complaints in the underlying AWP litigation, the circuit court concluded that no such allegations were made.[11]

Mylan, in its brief to this Court, argues that the term "misappropriation" is ambiguous because it is susceptible of more than one meaning. According to Mylan, case law and dictionary definitions support the construction of the term "misappropriation" to include "misuse." Therefore, concludes Mylan, the policy language at issue does not require that the "advertising idea" misappropriated

be owned by another, but only that Mylan misused an "advertising idea."

▉▉▉ With regard to the general principles of construing the provisions of an insurance policy, this Court has indicated that "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syllabus Point 1, *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 345 S.E.2d 33 (1986), *overruled, in part, on other grounds by National Mut. Ins. Co. v. McMahon & Sons,* 177 W.Va. 734, 356 S.E.2d 488 (1987). "Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syllabus, *Keffer v. Prudential Ins. Co.,* 153 W.Va. 813, 172 S.E.2d 714 (1970). Concerning whether terms in an insurance policy are ambiguous, this Court has explained that "[w]henever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous."

---

disparages a person's or organization's goods, products, or services;
  b. Oral or written publication of material that violates a person's right of privacy;
  c. Misappropriation of advertising ideas or style of doing business; or
  d. Infringement of copyright, title or slogan.
As noted above, the issue in this case concerns whether Mylan is alleged in the AWP litigation to have misappropriated advertising ideas or style of doing business.

9. Wausau policy numbers 0526–00–101388 through 0520–00–101388 provide in relevant part:
  1. "Advertising injury" means injury, other than "bodily injury" or "property damage" or "personal injury," arising out of one or more of the following offenses committed in the course of "your advertising activities":
  a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
  b. Oral or written publication of material that violates a person's right of privacy;
  c. Misappropriation of advertising ideas; or
  d. Infringement of copyright, title or slogan.

10. Wausau policy number 0521–00–101388 provides in relevant part:
  1. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
  a. False arrest, detention or imprisonment;
  b. Malicious prosecution;
  c. The wrongful eviction from, wrongful entry into, or invasion of the right to private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor;
  d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
  e. Oral or written publication of material that violates a person's right of privacy;
  f. The use of another's advertising idea in your "advertisement"; or
  g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

11. Having determined that the claims of the plaintiffs in the underlying AWP litigation fall outside of any coverage afforded by the relevant insurance policies, the circuit court declined to address the issue raised by the appellees of whether the claims fall within any named exclusions provided for in the policies.

Syllabus Point 1, *Prete v. Merchants Property Ins. Co.*, 159 W.Va. 508, 223 S.E.2d 441 (1976). However, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syllabus Point 1, *Berkeley Co. Pub. Serv. v. Vitro Corp.*, 152 W.Va. 252, 162 S.E.2d 189 (1968). If a court determines that a policy provision is ambiguous, "[i]t is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syllabus Point 4, *National Mut. Ins. Co. v. McMahon & Sons*, 177 W.Va. 734, 356 S.E.2d 488 (1987), *overruled on other grounds by Potesta v. U.S. Fidelity & Guaranty Co.*, 202 W.Va. 308, 504 S.E.2d 135 (1998). Finally, "included in the consideration of whether the insurer has a duty to defend is whether the allegations in the complaint ... are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policies." Syllabus Point 3, in part, *Bruceton Bank v. U.S. Fid. and Guar. Ins.*, 199 W.Va. 548, 486 S.E.2d 19 (1997).

■ This Court has carefully considered all of the case law cited to us by the parties. After considering the arguments of the parties and supporting authority, this Court finds that the term "misappropriation" as used in the "Advertising Injury" context ordinarily means to take or acquire wrongfully. Several courts have reached this conclusion in "Advertising Injury" cases.[12] *See State Auto Property and Cas. v. Trav. Indem. Co.*, 343 F.3d 249, 257 (4th Cir.2003) ("the term 'misappropriation' ... refers generally to the wrongful acquisition of property"); *Ameri-*

*can Employ. Ins. Co. v. DeLorme Pub. Co.*, 39 F.Supp.2d 64, 77 (D.Me.1999) ("The ordinary meaning of 'misappropriate' is not ambiguous or unclear. It means '[t]o appropriate wrongly;' that is to wrongfully 'take or make use of without authority or right.'" *Citing Webster's New Collegiate Dictionary*, 98, 758 (9th ed.1987)); *American Economy Ins. Co. v. Reboans, Inc.*, 852 F.Supp. 875, 881 (N.D.Cal.1994) ("the word 'misappropriation' in its ordinary and popular sense [is] ... a synonym for 'to take wrongfully.'"); *American States Ins. Co. v. Vortherms*, 5 S.W.3d 538, 543 (Mo.Ct.App.1999) ("a misappropriation of an advertising idea involves the wrongful taking of another's manner of advertising" (citation omitted)); *Fluoroware, v. Chubb Group of Ins. Companies*, 545 N.W.2d 678, 682 (Minn.Ct.App.1996) ("'misappropriation of advertising ideas' has been defined as the wrongful taking of another's manner of advertising").[13]

■ Having concluded that the ordinary meaning of the term "misappropriation" is to take or acquire wrongfully, this Court must next determine whether the allegations in the AWP complaints are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policies. The allegations in the AWP litigation are that once Mylan created the spread in average wholesale prices, it marketed the spread to drug providers in order to give them an incentive to sell Mylan-manufactured drugs. We conclude that these allegations are not reasonably susceptible of an interpretation that they may be covered by an insurance policy providing coverage for misappropriating another party's advertising idea or style of doing business.[14]

12. In "Advertising Injury" cases, the meaning of the term "misappropriation" generally arises when courts are addressing the issue of whether the term refers only to the common law tort of misappropriation which does not protect against injuries resulting from the wrongful use of a trademark or whether the term applies more broadly to the wrongful acquisition of any property. *See State Auto Prop. and Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 256 (4th Cir.2003).

13. Mylan cites this Court's opinion in *Lawyer Disciplinary Bd. v. Battistelli*, 206 W.Va. 197, 523

S.E.2d 257 (1999) to support its argument that a reasonable definition of "misappropriation" is to "misuse." However, our discussion in *Battistelli* concerned the misappropriation of client funds by an attorney and not insurance policy language concerning coverage for an "Advertising Injury." Therefore, we do not find *Battistelli* instructive in the instant case.

14. For the same reason, we find that the provision in the Wausau policy for coverage of "[t]he use of another's advertising idea in your 'advertisement'" does not provide coverage for the acts alleged in the underlying complaints.

For this reason, we affirm the circuit court's grant of summary judgment on this issue.[15]

### 2. Federal's Duty to Defend in the AWP Litigation for "Personal Injury" defined as "Discrimination"

██ Second, Mylan assigns error in the circuit court's conclusion that the claims in the AWP litigation do not allege personal injury or discrimination, and, therefore, the duty to defend is not triggered under Federal's Umbrella Policy.

Coverage B of the Federal policy provides, in relevant part, that Federal will defend any suit alleging "Personal Injury."[16] The policy defines "Personal Injury" as follows:

> **Personal injury** means injury, other than **bodily injury,** arising out of one or more of the following offenses committed in the course of your business, other than your advertising:
>
> 1. false arrest, detention or imprisonment;
>
> 2. malicious prosecution;
>
> 3. the wrongful eviction from, wrongful entry into, invasion of the right of private occupancy of a room, dwelling or premises that a person or persons occupy, by or on behalf of its owner, landlord or lessor;
>
> 4. oral or written publication of material that slanders or libels a person or organization;
>
> 5. oral or written publication of material that violates a person's right of privacy, or
>
> 6. discrimination (unless insurance thereof is prohibited by law).

The issue in this case concerns the definition of "Personal Injury" as "Discrimination." Specifically the question is whether the allegations in the AWP complaints allege discrimination as covered by the Federal policy. In finding that Federal had no duty to defend under the facts of this case, the circuit court reasoned as follows:

> As used in the "Personal Injury" section of the Federal policy, "discrimination" refers to the standard types of discrimination (*e.g.* race, handicap) and not, as asserted by Mylan, "any form of discrimination within the field of commerce," which is the definition of "economic discrimination." *USX Corp. v. Adriatic Ins. Co.,* 99 F.Supp.2d 593, 624–25 (W.D.Pa.2000) (finding that, when viewed in context with the other enumerated offenses in the definition of "personal injury," the meaning of "discrimination" is limited to differential treatment of a person based upon immutable characteristics such as race, sex, age, religion, or national origin). Thus, the dictionary definitions relied upon by Mylan do not, in fact, support Mylan's interpretation of the term, which must be read in concert with the rest of the policy language and not in a vacuum.
>
> Even if the Court were to adopt the reasoning of *Federal Ins. Co. v. Stroh*

---

**15.** This Court also seriously doubts that informing drug providers of the price spread constitutes an "advertising idea." "[T]o be covered by the policy, allegations of … misappropriation have to involve an advertising *idea,* not just a nonadvertising idea that is made the subject of advertising." *CAT Internet Serv. v. Providence Washington Ins.,* 333 F.3d 138, 142 (3rd Cir.2003), quoting *Green Machine Corporation v. Zurich— American Insurance Group,* 313 F.3d 837, 839 (3d.Cir.2002). The mere publication to drug providers of the price spread in the wholesale price of generic drugs does not constitute an advertising idea. Moreover, there appears to be no allegation in the complaints below of an "Advertising Injury" arising out of the wrongful taking or acquisition of an advertising idea. Instead, the injury alleged arises from the paying of inflated average wholesale prices.

**16.** Federal's Coverage A excess liability coverage obligates Federal to defend suits only if the applicable underlying insurance in the Wausau policies has been exhausted. Having found that no provision in the Wausau policies cover the allegations in the AWP suits, only Federal's Coverage B umbrella coverage is potentially implicated in this case.

In addition, Federal can have no duty to defend Mylan in the underlying AWP litigation under the Coverage B "Advertising Injury" coverage for the same reasons that American Motorists, Continental, and Wausau have no duty to defend under the "Advertising Injury" coverage in their respective policies. Therefore, only the "Personal Injury" coverage in Federal's Coverage B is potentially implicated with regard to Federal's duty to defend.

*Brewing Co.*, 127 F.3d 563 (7th Cir.1997), as urged by Mylan, the AWP claims do not allege price discrimination because claimants in the underlying suits are not entities that would purchase Mylan products. Rather, the AWP claims allege fraud regarding the excessive funds Medicare, Medicaid, and third-party payors reimbursed to medical providers and pharmacies based on Mylan's alleged artificially inflated AWP listing.

It is Mylan's position that the term "discrimination" is ambiguous in that it is reasonably susceptible to more than one meaning. Consequently, says Mylan, the term should be construed against Federal. Mylan further asserts that a reasonable construction of the term "discrimination" is economic or price discrimination. According to Mylan, the AWP complaints below expressly allege that Mylan charged some drug providers lower prices than others. Mylan therefore concludes that the term "Discrimination" in the Federal policies should be read as providing coverage for economic discrimination as alleged in the underlying AWP complaints.

In support of its argument, Mylan relies primarily on the case of *Federal Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563 (7th Cir. 1997). In *Stroh Brewing*, G. Heileman Brewery Company, Inc. purchased an umbrella business liability insurance policy from Federal Insurance Company. Subsequently, a wholesale beer distributor sued Heileman for alleged discrimination based on Heileman's pricing practices. One issue in the case was the applicability of the term "discrimination" under the definition of "personal injury" in the Federal policy. The definition of "personal injury" read as follows:

Personal Injury Means

a. false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution;

b. libel, slander, defamation of character, or invasion of the rights of privacy, unless arising out of advertising activities;

c. humiliation or discrimination....

127 F.3d at 570 n. 11. In finding that the term "discrimination" in the Federal policy applied to price discrimination allegations,

the court cited several cases in which the term "discrimination" was found to refer generally to differential treatment. The court also cited the 1990 edition of *Black's Law Dictionary* which defined "discrimination" to mean price discrimination. The court then concluded:

Because the term "discrimination" is not defined in the policy and because price discrimination suits such as [the instant one] are common in the beer industry, it is not objectively unreasonable for Heileman to have believed that it was purchasing coverage for just such a suit [as the instant one]. This may be the case even though in the present day "discrimination" might bring first to mind differences in personal treatment.

127 F.3d at 569 (citations omitted).

In its decision below, the circuit court relied upon the case of *USX Corp. v. Adriatic Insurance Co., supra,* affirmed by 345 F.3d 190 (3rd Cir.2003). In *USX*, the plaintiffs advanced the theory that the term "discrimination" in an insurance policy should be construed to encompass economic and price discrimination. In rejecting this construction, the *USX* court explained:

The context in which the term "discrimination" is used once again sufficiently undercuts the plaintiffs' attempt to rewrite the policy under the reasonable expectations doctrine and principles of insurance law regarding ambiguities. It may be as the majority stated in *Stroh Brewing* that "[t]ime was, 'discrimination' might have brought immediately to mind charging one person more than another for the same product." *Stroh Brewing*, 127 F.3d at 564. To suggest, however, that the use of that term in defining "personal injuries" was intended to identify a distinct form of statutory liability created 85 years ago by the Sherman Act and commonly known as "antitrust liability" stretches the term beyond any natural and ordinary meaning to be gleaned from its use in context. The term is preceded by "false arrest, false imprisonment, wrongful eviction, detection [and] malicious prosecution" and is followed by "humiliation [and] libel, slander or defama-

tion of character or invasion of rights of privacy, except that which arises out of any advertising activities." The terms preceding the phrase identify offenses against the individual for wrongful deprivation of liberty or interference with the right to peaceful possession of property and those that follow it identify common offenses which injure the character or reputation of an individual. Of course, "discrimination" and its companion "humiliation" are forms of disparate or demeaning treatment of persons commonly accomplished through unjust economic treatment, and such terms are indeed related to forms of "mental injury, mental anguish [and] shock" as their contextual placement within the policy demonstrates. And price discrimination claims may well be analogous to this understanding in certain settings. But to suggest that hiding among these causes of harm to the person included in personal injury coverage is a form of discrimination which encompasses broad-based economic practices which injure markets through the improper elimination of competition accomplished by purposeful manipulation of goods and services reflects a highly implausible definition or meaning of that term.

99 F.Supp.2d at 624–625.

■ After careful consideration of the authorities cited above, we find the reasoning of the court in *USX* to be persuasive. "It is a fundamental rule of construction that in accordance with the maxim '*noscitur a sociis*' the meaning of a word or phrase may be ascertained by reference to the meaning of other words or phrases with which it is associated." *Wolfe v. Forbes, et al.*, 159 W.Va. 34, 44, 217 S.E.2d 899, 905 (1975) (*citing* 17

M.J. Statutes § 63 (1951) (other internal citations omitted)). Similar to the policy language in the *USX* case, the term "personal injury" in the Federal policies is defined by offenses against the liberty, emotional well-being, reputation, or peaceful possession of property of the plaintiff as opposed to economic injury. These offenses include false arrest; malicious prosecution; wrongful eviction from, entry into, or invasion of the right of occupancy of one's property; slander and libel; and violation of the right of privacy. In this context, the term "discrimination" ordinarily would be understood to mean the type of discrimination based on personal characteristics actionable under federal Title VII or the State Human Rights Act. Even the court in *Stroh Brewing Co.* acknowledged that the term "discrimination" ordinarily is perceived to refer to discrimination based on an individual's personal characteristic:

> Say "discrimination" today and those around you may think of race or sex discrimination, usually in connection with a school or work setting. But that has not always been the case. Time was, "discrimination" might have brought immediately to mind charging one person more than another for the same product. That definition, although perhaps less in public consciousness, remains just as valid today.

127 F.3d at 564. Finally, we believe that it is significant that the term "discrimination" appears in the "personal injury" section of the Federal policy. Given this fact, it is difficult for this Court to believe that Mylan reasonably believed when it purchased the Federal policies that it was purchasing coverage for injuries arising from the marketing of a fraudulent pricing scheme.[17]

---

17. With regard to its dictionary definition, "discrimination" has come to mean primarily unfair treatment based upon personal characteristics, generally immutable, such as race, age, sex, nationality, or religion. For example, the 1990 edition of *Black's Law Dictionary*, which appears to have been the current edition for a portion of the coverage period of the Federal policy at issue herein, defined "discrimination" as:

> In constitutional law, the effect of a statute or established practice which confers particular privileges on a class arbitrarily selected from a large number of persons, all of whom stand in the same relation to the privileges granted and between whom and those not favored no reasonable distinction can be found. *Unfair treatment or denial of normal privileges to persons because of their race, age, sex, nationality or religion.* A failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.

*Black's Law Dictionary* 467 (6th ed.1990) (emphasis added and citation omitted).

The 1999 edition of the dictionary, which appears to have been the current edition for a portion of the coverage period of the subject Federal policies, had as its first definition of

In its brief to this Court, Mylan proffers several reasons why this Court should not adopt the reasoning in *USX*, none of which we find valid. For example, Mylan argues that *USX* is not persuasive because in that case, the policy language at issue was jointly drafted. In contrast, says Mylan, Federal's policy is a standard form policy issued by Federal to Mylan. We note, however, that the policies in *USX* were "in all material respects, based upon a standard insurance form known as 'the 1971 London umbrella wording.'" *USX Corp.*, 99 F.Supp.2d at 602.

Mylan also relies for support on the fact that Federal subsequently issued a policy in which it limited the definition of "discrimination" to personal characteristics. According to Mylan, this indicates that Federal could have adopted the language limiting the term "discrimination" earlier had it chosen to do so. Mylan asserts that Federal should not now ask this Court to rewrite the policy language at issue. We do not find this argument to be persuasive. Federal asserts in its brief that it implemented the policy revision after, and in direct response to, the court's holding in *Stroh Brewing Co.* According to Federal, if, as Mylan suggests, Federal had intended to cover economic discrimination, it would not have revised its policy language after the *Stroh Brewing* decision expanded the scope of coverage to encompass economic discrimination.

In addition, Mylan argues that the court's reasoning in *USX Corp.* is inapposite to the instant facts because unlike the policies in *USX Corp.* the Federal polices in this case do not join the term "discrimination" with "humiliation" under the definition of "Personal Injury," which was integral to the court's rationale in *USX Corp.* We disagree. Despite the absence of the term "humiliation" in the Federal policy, the fact remains that the other definitions of "personal injury" in the Federal policy all denote offenses against the liberty, emotional well-being, reputation, or peaceful possession of property of the individual. Again, this indicates to this Court

that the term "Discrimination" should be given its ordinary meaning of referring to the offense of discriminating against an individual based on the individual's personal characteristics.

Mylan further contends that the fact that courts have disagreed about the meaning of the word "discrimination" in insurance policies indicates that the term is ambiguous. In support of this contention, Mylan cites a footnote from this Court's opinion in *Murray v. State Farm Fire and Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1 (1998), in which this Court indicated that "[a] provision in an insurance policy may be deemed to be ambiguous if courts in other jurisdictions have interpreted the provision in different ways. This rule is based on the understanding that 'one cannot expect a mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance.'" 203 W.Va. at 485 n. 5, 509 S.E.2d at 9 n. 5, (*citing* C. Marvel, *Division of Opinion Among Judges on Same Court or Among Other Courts or Jurisdictions Considering Same Question, As Evidence That Particular Clause of Insurance Policy is Ambiguous*, 4 A.L.R.4th 1253, § 2[a] (1981)). Mylan's reliance on a footnote is misplaced. This Court has held that "[N]ew points of law ... will be articulated through syllabus points as required by our state constitution." Syllabus Point 2, in part, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001). Also, "language in a footnote generally should be considered obiter dicta which, by definition, is language 'unnecessary to the decision in the case and therefore not precedential.'" *State ex rel. Medical Assurance v. Recht*, 213 W.Va. 457, 471, 583 S.E.2d 80, 94 (2003) (citing *Black's Law Dictionary* 1100 (7th ed.1999)).

Based on the above, we conclude that the term "discrimination" as used in the Federal policy is not ambiguous. To the contrary, the term ordinarily means differential treatment based on a personal character-

"discrimination," "[t]he effect of or established practice that confers privileges on a certain class or that denies privileges to a certain class because of race, age, sex, nationality, religion, or handicap." *Black's Law Dictionary* 479 (7th

ed.1999). This is also the first definition in the most recent edition of the dictionary except that the term "handicap" is replaced with the term "disability." *See Black's Law Dictionary* 534 (9th ed.2009).

istic, generally immutable, such as race, age, sex, nationality, religion, or disability. Having so concluded, this Court must next determine whether the allegations in the AWP litigation are reasonably susceptible of an interpretation that the claims may be covered by the term "Discrimination" in the Federal policies. We find that they are not. While there are claims that some drug providers may have been sold drugs at a lower price than others, there are no allegations that this difference in treatment was based on race, age, sex, nationality, religion, or disability. Therefore, we affirm the circuit court's grant of summary judgment on this issue.[18]

### 3. Wausau's Duty to Defend Mylan in the L & C Litigation for "Advertising Injury" and "Bodily Injury" under its Policies

■ In its third assignment of error, Mylan challenges the circuit court's finding that coverage for an "advertising injury" or "bodily injury" under the Wausau policies is inapplicable to this case, and thus Wausau had no duty to defend Mylan in the L & C litigation.[19] As noted above, Wausau policies 0526–00–101388 through 0520–00–101388 define "Advertising Injury" to include injury arising out of the "misappropriation of advertising ideas."[20] Mylan notes that in the L & C litigation below, it was alleged that Mylan initiated a "Campaign for Fair Pharmaceutical Competition" in order to confront criticism over and explain the profits it was making from its price increases for Lorazepam and Clorazepate. According to Mylan, the allegation in the complaints with regard to its fair pricing campaign triggered potential insurance coverage under the same "advertising injury" offenses at issue in the AWP actions. Mylan further avers that its fair pricing campaign is an advertising con-

cept that falls within the offense of "misappropriation of an advertising idea" which should be understood to include the misuse of an idea related to the promotion of a product to the public.

We reject Mylan's argument. This Court found above that the term "misappropriation" ordinarily means to take or acquire wrongfully. The allegations in the L & C litigation that Mylan conducted a "Campaign for Fair Pharmaceutical Competition" to confront criticism over the profits it was reaping from its price increases for Lorazepam and Clorazepate is not susceptible of an interpretation that the claim may be covered for misappropriating another party's advertising idea. Accordingly, we affirm the circuit court's grant of summary judgment on this issue.

■ Next, Mylan opines that the circuit court erred in finding that Wausau has no duty to defend Mylan in the L & C litigation for damages arising from a "bodily injury" under the Wausau policies. The term "bodily injury" is defined in Wausau policy numbers 0526–00–101388 through 0521–00–101388 as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

According to Mylan, the complaints in the L & C litigation expressly allege that Mylan's actions caused bodily injury. In support of this contention, Mylan quotes the following language from complaints in the L & C litigation:

As a result of these substantial and unprecedented agreements and price increases for lorazepam and clorazepate tablets, many purchasers, including ... patients, consumers and others have paid substantially higher prices. Moreover, some patients may have stopped taking lorazepam

---

**18.** Federal can have no duty to defend Mylan in the AWP litigation under its Coverage B "Advertising Injury" coverage for the same reasons that American Motorists, Continental, and Wausau have no duty to defend under their "Advertising Injury" coverage discussed above.

**19.** Apparently, Mylan alleged below that American Motorists and Continental had coverage solely for the AWP Actions and that coverage existed solely under their "advertising injury" coverage

and not for "personal injury," "bodily injury," or any other coverage.

**20.** Wausau policy number 0521–00–101388 defines "Advertising Injury" to include injury arising out of "use of another's advertising idea in your 'advertisement.'" Mylan has failed to show that there are any allegations in the L & C litigation that Mylan's fair pricing campaign included the use of another's advertising idea.

and clorazepam tablets altogether, or been forced to reduce the quantity they take, because they cannot afford them.

The acts and practices of the Defendants as herein alleged have had the purpose or effect, or tendency or capacity, to restrain competition unreasonably and to injure competition within each State and throughout the United States in the following ways, among others ...

Depriving consumers of access to needed pharmaceuticals and thereby injurying their health. (Footnotes omitted).

In finding that claims against Mylan in the L & C litigation are not susceptible of being covered by an insurance policy providing coverage for "bodily injury," the circuit court found that "bodily injury" is not alleged in the L & C litigation:

Rather, the L & C suits involve economic injury, in that Mylan increased the price of Lorazepam and Clorazepam by 1,900—2000% following its entry into the exclusive licensing agreements with ingredient suppliers. The only contention that comes close to one asserting covered "bodily injury" is Mylan's speculative assertion that some consumers may not have been able to afford their medications due to the price hikes by Mylan. However, as no such specific claims for bodily injury are alleged in any of the underlying complaints, the "Bodily Injury" coverage in the Wausau Policies is not triggered.

We agree with the circuit court. The reference to injured health quoted above is simply too brief and speculative to trigger coverage for a "bodily injury" under the Wausau policies. The plaintiffs in the L & C litigation are not persons alleging bodily injuries as a result of Mylan's conduct. Rather, these plaintiffs allege economic injury. As such, the complaints filed in the L & C litigation are not susceptible of an interpretation that

the claims may be covered for "bodily injury." Therefore, we affirm the circuit court's order on this issue.

### 4. Federal's Duty to Defend Mylan in the L & C Litigation for "Personal Injury" defined as "Discrimination"

Finally, Mylan asserts error in the circuit court's finding that the underlying claims in the L & C litigation do not allege personal injury or discrimination, and thus the duty to defend Mylan is not triggered under Federal's Umbrella policy. Mylan argues that for the reasons previously asserted in its discussion of the AWP actions, coverage for "discrimination" includes forms of disparate treatment like economic discrimination. Specifically, the allegations in the L & C actions implicate coverage for "discrimination" in that plaintiffs paid too much for only two drugs, Lorazepam and Clorazepate. Mylan allegedly selected these drugs because they are used to treat patients with chronic medical conditions, thus requiring long-term use, as opposed to drugs used to treat short-term conditions. According to Mylan, its alleged focus on L & C drugs, out of all other drugs, was discriminatory.

As this Court concluded above, the term "discrimination" included under the definition of "personal injury" in Coverage B of the Federal umbrella policies ordinarily means differential treatment based on a personal characteristic, generally immutable, such as race, age, sex, nationality, religion, or disability. Mylan has failed to show that there are allegations in the complaints in the L & C litigation that are reasonably susceptible of an interpretation that the claims may be covered as a "personal injury" under the definition of that term in the Federal umbrella policy. For this reason, this Court affirms the circuit court's grant of summary judgment on this issue.[21]

---

**21.** In its brief to this Court, Mylan makes two other arguments that we feel compelled to briefly address. First, Mylan states that the circuit court did not make findings of fact but simply referenced facts that it deemed pertinent to its conclusions. According to Mylan, in ignoring the fact allegations in the complaints below upon which Mylan relied, the circuit court failed to determine if these facts could potentially give rise to coverage. We find this argument to be inval-

id. The circuit court's 38–page order contained sufficient facts to support its legal reasoning and to provide this Court with a meaningful review.

Second, Mylan posits that any dispute as to whether the factual allegations are within coverage alone compels a defense. For this proposition, Mylan cites *American Cyanamid Co. v. American Home Assur. Co.*, 30 Cal.App.4th 969, 975, 35 Cal.Rptr.2d 920, 923 (1994) ("If the

## IV.

## CONCLUSION

For the reasons set forth above, this Court affirms the February 8, 2007 order of the Circuit Court of Monongalia County which ruled that American Motorists, Continental, Wausau, and Federal have no duty to defend Mylan, pursuant to certain insurance policies, in the underlying AWP and L & C litigation.

**Affirmed.**

Justice McHUGH, deeming himself disqualified, did not participate in the decision of this case.

Judge BEANE, sitting by temporary designation.

parties dispute whether the insured's alleged misconduct is potentially within the policy coverage … 'the duty to defend is then established[.]' ''). However, this is not the law of this Court. Rather, before a duty to defend arises, the allegations in the complaint must be *reasonably* susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. *Bruceton Bank v. U.S. Fid. and Guar. Inc., supra.*