*Maryland Casualty Company, et al. v. Blackstone International Ltd., et al.*, No. 51, September Term, 2014, Opinion by Adkins, J.

**INSURANCE LAW — POLICY INTERPRETATION — INSURER'S DUTY TO DEFEND — ADVERTISING INJURY:** The underlying complaint did not implicate an advertising injury when there was no causation between the injury suffered and the insured's advertisement activities.

Circuit Court for Baltimore County
Case No.: 03-C-11-004834
Argued:  February 5, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2014

MARYLAND CASUALTY COMPANY, et al.

v.

BLACKSTONE INTERNATIONAL LTD, et al.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Adkins, J.
Battaglia and Watts, JJ., dissent

Filed:  April 21, 2015

Under Maryland law, an insurance company has a duty to defend its insured for any claims brought against it that are potentially covered under the insured's policy. Thus, a duty to defend may extend even beyond instances in which an insured is liable and the insurer must indemnify. In this case, we must assess whether an insurance company had a duty to defend its insured under a commercial general liability policy's "advertising injury" clause against a suit sounding in breach of contract and arising out of a joint business venture.

## FACTS AND LEGAL PROCEEDINGS[1]

### The Business Venture

In October 2006, Robert M. Gray, President of RMG Direct, Inc. ("RMG"), first met John F. Black, President and Chief Executive Officer of Blackstone International, Ltd. ("Blackstone"). During their initial conversation, Black informed Gray that he "was in the business of manufacturing and selling lamps and other lighting products designed to assist low vision consumers." Gray then informed Black of his role at RMG and his "professional background in the vision field." The two men then proposed a joint venture to "market and sell lighting products to people with low vision problems," and agreed to discuss the venture at a later date.

Approximately one month later, Gray and Black met to discuss the possibility of working together. At this time, Gray outlined his experience in low vision medicine and

---

[1] The facts of the underlying action are drawn from that suit's Second Amended Complaint, which forms the basis of our analysis in determining potentiality of insurance coverage, as discussed *infra*.

his working relationships with many of the field's leading practitioners. In early December 2006, Gray visited Blackstone's offices, where he met Blackstone's Product Development Manager and a member of its sales department. At this meeting, Black and Gray "agreed that RMG and Blackstone would form a confidential relationship and collaborate [on a] joint venture to develop plans for the design, marketing and sale of low vision lighting products to retailers[.]" Gray also agreed to work "in exchange for remuneration."

Throughout the next four years, Gray—working on behalf of RMG—worked in collaboration with Black and Blackstone employees to develop and market their joint venture. During this time, Gray performed multiple tasks without compensation, including: (1) developing the product brand name "Vision Enhance"; (2) creating graphics for use in sales sheets; (3) developing and reviewing packaging and marketing of "Vision Enhance"; (4) contacting low vision experts and sufferers on behalf of the venture, which involved obtaining written testimonials; and (5) "procur[ing] the placement of a full page color ad[vertisement in an industry journal,] introducing the 'Vision Enhance' brand."

As part of his work with Blackstone, Gray participated in the development of a sales presentation to Wal-Mart Stores, Inc. ("Wal-Mart") in an effort to place the product line for sale in its stores. Although Gray did not attend the presentation, he played a significant role in creating the materials and responding to Wal-Mart's inquiries. Although Black had informed Gray that no progress had been made with Wal-Mart, Gray learned that "Vision Enhance" was stocked and sold in Wal-Mart locations across the United States. Blackstone continued to sell "Vision Enhance" and other low vision lighting products—which Gray believes were procured through its initial relationship with the retailer via "Vision

2

Enhance"—under the label "Mainstays" at Wal-Mart locations. Blackstone "us[ed] all, or substantially all, of the ideas, information, input and efforts of Gray[,]" including "the use of the 'Vision Enhance' name on the boxes[, and use of] the same or substantially similar box design, copy on the box, and product instructions[.]"

While performing this work for Blackstone, Gray believed that RMG and Blackstone had reached an agreement that Blackstone would create a new division for its low vision products, and that RMG would receive a 7% sales commission for and a 50% equity interest in the low vision products. In mid-2007, Gray approached Black in an effort to memorialize their verbal agreement. Over the course of the following months, Gray proposed multiple written agreements, each of which Black modified or rejected. The two men never reached a written agreement.

On February 22, 2010, RMG filed suit against Blackstone and Black in the Circuit Court for Baltimore County. It later filed two amended complaints, alleging substantially the same facts and the following causes of action: breach of contract (Count I); promissory estoppel (Count II); unjust enrichment (Count III); quantum meruit (Count IV); intentional misrepresentation (Count V); and accounting (Count VI). This Second Amended Complaint formed the basis of the underlying suit.

**Blackstone's Insurance Policy**

Blackstone has been insured by Maryland Casualty Company and Northern Insurance Company of New York (collectively, "Insurers") for commercial general liability insurance since 2001. Its Commercial General Liability Coverage Form (the

3

"Policy") included coverage for Personal and Advertising Injury Liability.  In relevant part,

the Policy provides:

> [Insurer] will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit"[2] seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.[3]

In part, the Policy defines "personal and advertising injury" as "injury . . . arising out of . . .

[t]he use of another's advertising idea in your 'advertisement.'"[4]  Under the terms of the

---

[2] The Policy defines "Suit" as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which th[e] insurance applies are alleged," including an arbitration or other alternative dispute resolution proceeding.

[3] Additionally, the Policy excluded the following:
"Personal and advertising injury":
(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";
* * *
(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement"[.]

[4] In full, the Policy—including an endorsement to the Policy amending paragraph "f"—defines personal and advertising injury as follows:
"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
a. False arrest, detention or imprisonment;
b. Malicious prosecution;

4

Policy, "'Advertisement' means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."[5]

On February 17, 2011, Blackstone and Black wrote to Insurers, requesting coverage and litigation defense under the personal and advertising injury provisions of the Policy.[6] On May 17, 2011, Insurers filed a Complaint for Declaratory Judgment, seeking a

---

  c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  e. Oral or written publication of material that violates a person's right of privacy;

  f. The use of another's advertising idea in your "advertisement"; or

  g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

[5] This definition appears in an endorsement to the policy, which amended the Policy's original definition of advertisement. The definition also provides:

  a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

  b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

[6] Upon reviewing the claim, Insurers learned that Blackstone and Black had moved to strike the first two complaints and that by the time they became involved, the deadline to move to strike the Second Amended Complaint—from which the facts of the underlying litigation were drawn—had passed and was therefore the operative complaint.

judgment that they had no duty to defend the claims because, they argued, the Second Amended Complaint did not allege that Blackstone had engaged in advertising, that RMG had suffered an advertising injury, or that there was any "causal connection between any of RMG's claimed damages . . . and any advertising conducted by Blackstone." Insurers also contended that all six counts in the Second Amended Complaint were excluded from coverage by the Policy's terms. Thus, Insurers asserted, there was no potentiality of coverage for Blackstone's claim, and Insurers had no duty to defend.

## Summary Judgment Proceedings

The parties filed cross motions for summary judgment. Following a hearing, the Circuit Court entered summary judgment in favor of Insurers. Blackstone appealed to the Court of Special Appeals, which reversed the Circuit Court. *Blackstone Int'l Ltd. v. Md. Cas. Co.*, 216 Md. App. 471, 477, 88 A.3d 792, 795 (2014).

The intermediate appellate court concluded that the Policy's definition of "advertisement" was implicated in a Blackstone website that allegedly used RMG's advertising ideas, that "Vision Enhancement" product packaging constituted an advertisement, and that Gray's advertising ideas could be described as "another's," although Blackstone contended that it owned the rights to the ideas due to its agreement with RMG. *Id.* at 482–85, 88 A.3d at 798–800. The Court of Special Appeals also rejected Insurers' contention that RMG did not allege an advertising injury. *Id.* at 486, 88 A.3d at 801. Concluding that Insurers had waived any defense raised by the Policy's exclusions, it reasoned that their duty to defend depended only upon whether RMG's claims "'arose out of' the use of RMG's advertising ideas in Blackstone's advertisements, without regard

6

to whether the acts were intentional or rooted in breach of contract." *Id.* at 488–89, 88 A.3d at 802–03. The court also relied upon the exclusions as support for its conclusion that "had intentional conduct and breaches of contract *not* been excluded, they would fall *within* the agreement's broad and unambiguous definition of 'advertising injury.'" *Id.* at 488, 88 A.3d at 802 (emphasis in original). The Court of Special Appeals concluded that RMG's unjust enrichment claim did arise out of Blackstone's use of its advertising idea, and, thus, that Maryland law obligated Insurers to defend Blackstone against all of RMG's claims. *Id.* at 489–90, 88 A.3d at 803–04.

We granted Insurers' Amended Petition for Writ of Certiorari to consider the following questions:

1. Did the [Court of Special Appeals] err in holding that product packaging was "advertisement," and that the "use of another's advertising idea" need not be "wrongful use," when it substituted its own definitions of those terms for the clear and unambiguous definitions contained in the Policy?

2. Did the [Court of Special Appeals] err in applying this Court's binding precedent requiring an insured to establish all three elements of coverage for "advertising injury" to trigger the duty to defend by concluding that the "causal relationship" element was not necessary in this case?

3. Did the [Court of Special Appeals] err in finding that Insurers waived policy exclusions as bases for denial of coverage and creating liability beyond the bounds of the Policy when, as a matter of public policy, coverage may not be expanded by waiver?

4. Did the [Court of Special Appeals] err in finding that Insurers waived Policy exclusions as bases for denial of coverage when policy exclusion defenses were raised, argued, and preserved at the trial court level and on appeal?

Because we answer yes to the second question, we need not address the other questions and shall reverse the judgment of the Court of Special of Appeals.

**STANDARD OF REVIEW**

We review a grant of summary judgment as a matter of law. *Eng'g Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 229, 825 A.2d 966, 976 (2003). "The standard for appellate review of a trial court's grant or denial of a summary judgment motion is whether the trial court was legally correct." *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 638, 679 A.2d 540, 542 (1996) (citation omitted). Thus, we conduct an independent review of the record to determine whether a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98, 105–06 (2004). "We review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant." *Id.* at 14, 852 A.2d at 106 (citation omitted).

We construe an insurance policy according to contract principles. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540, 921 A.2d 245, 251 (2007). Maryland follows the objective law of contract interpretation. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166, 829 A.2d 540, 546 (2003). Thus, "'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Long v. State,* 371 Md. 72, 84, 807 A.2d 1, 8 (2002) (quoting *Slice v. Carozza Props., Inc.,* 215 Md. 357, 368, 137 A.2d 687, 693 (1958)). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking

8

into account the context in which it is used." *Sy-Lene*, 376 Md. at 167, 829 A.2d at 546 (citation omitted). "Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning." *Lloyd E. Mitchell, Inc. v. Md. Cas. Co.*, 324 Md. 44, 56–57, 595 A.2d 469, 475 (1991) (citations omitted). Although Maryland does not follow the rule that insurance contracts should be construed against the insurer as a matter of course, any ambiguity will be "'construed liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556–57, 769 A.2d 948, 957 (2001) (emphasis in original) (citation omitted).

## DISCUSSION

### Insurer's Duty To Defend And Potentiality Of Coverage

In *Brohawn v. Transamerica Insurance Company*, 276 Md. 396, 347 A.2d 842 (1975), we recognized an insurance company's duty to defend its insured for all claims which are potentially covered under an insurance policy. We explained:

> The obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, **the insurer still must defend if there is a potentiality that the claim could be covered by the policy**.

*Id.* at 407–08, 347 A.2d at 850 (emphasis added) (citations omitted). To ascertain whether an insurer has a duty to defend its insured, we engage in a two-part inquiry:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions

9

ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981).

"[W]here a potentiality of coverage is uncertain from the allegations of a complaint, any doubt must be resolved in favor of the insured." *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107, 651 A.2d 859, 863–64 (1995).

Bearing these principles in mind, we consider the allegations in RMG's Second Amended Complaint to determine whether the action potentially brings a claim within the Policy's coverage. In determining whether Insurers had a duty to defend, we are restricted in the first instance to the Second Amended Complaint and may not look to extrinsic evidence. *See Walk*, 382 Md. at 16, 852 A.2d at 106 ("An insured may rely on extrinsic evidence where the underlying complaint neither conclusively establishes nor negates a potentiality of coverage." (citation and internal quotation marks omitted)).[7] As will be evident in*fra*, because we find the terms of Blackstone's Policy and the allegations in

---

[7] *See also Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107, 651 A.2d 859, 863 (1995) ("Although we have held that an *insurer* may not use extrinsic evidence to contest coverage under an insurance policy if the tort suit complaint establishes a potentiality of coverage; we have not had occasion to determine whether an *insured* may rely on extrinsic evidence to establish a potentiality of coverage when the insurance policy and the allegations in the complaint do not establish a potentiality of coverage." (emphasis in original)).

10

RMG's Second Amended Complaint to be conclusive, we do not consider any extrinsic evidence.

### Advertising Injury In Commercial General Liability Policies

Blackstone contends it is entitled to insurance coverage under the advertising injury provision of its commercial general liability insurance policy. As discussed *supra*, the Policy[8] covers advertising injury, which it defines, in part, as "injury . . . arising out of . . . [t]he use of another's advertising idea in [Blackstone's] 'advertisement.'" It further defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about [Blackstone's] goods, products or services for the purpose of attracting customers or supporters." The Policy also contains an exclusion, which provides that advertising injury does not apply to that "[a]rising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement[.]"

In the Second Amended Complaint, RMG asserted breach of contract, promissory estoppel, unjust enrichment, quantum meruit, intentional misrepresentation, and accounting for allegations including: (1) developing the product brand name "Vision Enhance"; (2) creating graphics for use in sales sheets; (3) developing and reviewing packaging and marketing of "Vision Enhance"; (4) contacting low vision experts and

---

[8] The Policy closely tracks the Insurance Services Office, Inc. general commercial liability forms. Insurance Services Office, Inc., a subsidiary of Verisk Analytics, is an insurance industry organization that promulgates model insurance policy forms. Verisk Analytics, www.verisk.com/iso.html (last visited Apr. 13, 2015); Leo P. Martinez, Marc S. Mayerson & Douglas R. Richmond, 3 *New Appleman Insurance Law Practice Guide*, § 30.04[2][c], at 30-21 (2015). "Because of the overwhelming proliferation of [these] forms, an enormous body of case law exists to interpret them." *Id.*, § 30.04[2][c], at 30-21.

sufferers on behalf of the venture, including obtaining written testimonials; and (5) introducing the "Vision Enhance" brand by placing a full-page color advertisement in an industry journal.[9]

Provisions offering coverage for advertising injury became common in commercial general liability policies during the second half of the Twentieth Century. 2 Jeffrey W. Stempel, *Stempel on Insurance Contracts*, § 14.06[A] 14-60–62 (3d. ed., 2015 supp.). Such provisions "provide[] coverage for damages that occur in the course of the insured's advertising activities, arise out of one of the offenses enumerated in the policy, and occur during the policy period." 2 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, § 25.03, at 1970 (17th ed.). A court will consider three inquiries when determining whether a policy provides coverage for advertising injury: "(1) Is there an 'advertising injury' offense as defined by the policy?; (2) Was the offense committed in the course of advertising your goods, products or services?; and (3) Is there a causal connection between the advertising and the injury?"[10] 4 Leo P. Martinez, Marc S.

---

[9] Both the Court of Special Appeals and Insurers refer to Blackstone's website as an example of the underlying advertisement for the advertising injury. RMG's Second Amended Complaint makes no mention of the website. Even if we were to consider the website, our analysis and disposition based on the failure to meet the causation requirement, which is explained *infra*, would not change.

[10] The Dissent charges that we do not address the waiver issue. This presumes that we rely on the provision excluding breach of contract actions. We do not rely on the exclusion. Instead, our opinion is based on the case law addressing what constitutes an advertising injury, specifically the causal connection requirement. See, *e.g.*, *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 17, 852 A.2d 98, 107 (2004) ("The [p]olicy requires that the underlying plaintiffs allege the potential for three things: (1) an 'advertisement'; (2) an 'advertising injury,'. . . ; and (3) a causal relationship between the advertising injury and the alleged damages."). Relying on this same case law, we conclude that the issue of

Mayerson, & Douglas R. Richmond, *New Appleman Insurance Law Practice Guide*, § 43.15, at 43-23 (2015). These three elements have been recognized and applied in Maryland. *See Walk*, 382 Md. at 16–17, 852 A.2d at 107 ("The [p]olicy requires that the underlying plaintiffs allege the potential for three things: (1) an 'advertisement'; (2) an 'advertising injury,'. . . ; and (3) a causal relationship between the advertising injury and the alleged damages.").

### The Causal Connection Requirement

Insurers underscore the causal connection requirement. Citing *Walk*, they maintain that the Court of Special Appeals disregarded the requirement that there be a causal relationship between the advertising injury and the claimed damages and contend that RMG did not allege its damages were causally related to any Blackstone advertisement. For its part, Blackstone counters that the Court of Special Appeals considered the causal connection between advertisement and damages and properly concluded that it was subsumed in the Policy's definition of "advertising injury." It is helpful to preface our evaluation of these arguments with additional review of relevant authorities addressing advertising injury liability.

Advertising injury provisions are typically specified risk coverages whose terms "are designed to provide coverage for the enumerated claims only and not to provide

whether product packaging constitutes advertisement is immaterial to our decision. Because the three requirements to determine whether a policy will provide coverage are conjunctive, absence of a causal connection is dispositive.

13

generalized liability coverage." *Stempel* at 14-62.6. Thus, "[t]o be covered, the claims made against the policy holder must arise from advertising activity. A highly attenuated connection to advertising is not sufficient to create coverage." *Id.* at 14-62.7 (footnotes omitted).

To meet the causal connection requirement, "the advertising injury claimed must be 'caused by an offense committed in the course of advertising.'" 3 *New Appleman Law of Liability Insurance*, § 17.02[2][c], at 17-15 (2d ed. 2014). "When there are no allegations that the claimant suffered damages as a result of advertising, there will be no advertising injury claim." *New Appleman Insurance Law Practice Guide*, § 43.18, at 43-29 (citation omitted). Although courts "have not discussed the causation issue in terms of proximate cause versus 'but for' causation . . . there are overtones of this distinction in the caselaw." *Id.* Thus, "[t]he question is not whether the injury could have taken place without the advertising, but whether the advertising did in fact contribute materially to the injury." *Id.*

Courts have addressed advertising injury's causal connection requirement in a variety of different circumstances and have helped to define the parameters of coverage. At times, courts have found coverage. *See, e.g.*, *Am. Simmental Ass'n v. Coregis Ins. Co.*, 282 F.3d 582 (8th Cir. 2002) (advertising injury clause implicated when insured cattle breeders association misdesignated cattle as "fullblood" in marketing and advertising materials, thereby reducing value of true "fullblood" cattle) (Montana law); *R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242 (2d Cir. 2002) (advertising injury clause implicated when competitor's underlying complaint alleged that insured had marketed herbal teas in new packaging with trade dress confusingly similar to that of competitor's

14

boxes) (Connecticut law); *Letro Products, Inc. v. Liberty Mut. Ins. Co.*, 114 F.3d 1194 (9th Cir. 1997) (advertising injury clause implicated when insured infringed upon competitor's products when using photographs of competitor's products in its promotional materials) (California law); *Am. Safety & Risk Servs., Inc. v. Legion Indem. Co.*, 153 F. Supp. 2d 869 (E.D. La. 2001) (advertising injury clause implicated when insured falsely disseminated information that a competitor was no longer in business) (Louisiana law); *Merchants Co. v. Am. Motorists Ins. Co.*, 794 F. Supp. 611 (S.D. Miss. 1992) (advertising injury clause implicated when insured acquired and used competitor's secret customer list to send direct mail solicitations to those customers) (Mississippi law); *Air Eng'g, Inc. v. Indus. Air Power, LLC*, 346 Wis. 2d 9, 828 N.W.2d 565 (Wis. Ct. App. 2013), *review denied*, 353 Wis. 2d 839 N.W.2d 617 (Wis. 2013) (advertising injury clause implicated when company alleged that insured used its internet advertising system to place online ads for the purpose of attracting customers).

At other times the finding was no coverage. *See, e.g., Walk*, 382 Md. at 18, 852 A.2d at 108 (no advertising injury when complaint only alleged that insured "violated numerous agreements with his former employer not to solicit its clients or use its proprietary information"); *Pac. Group v. First State Ins. Co.*, 70 F.3d 524 (9th Cir. 1995) (no advertising injury when insured sabotaged a deal to purchase a third party's hotel so that it could squeeze a partner out of the deal and acquire the hotel at a lower price because the injury arose from the squeeze-out and not any advertising) (California law); *Info. Spectrum, Inc. v. The Hartford*, 182 N.J. 34, 860 A.2d 926 (2004) (no advertising injury when insured misappropriated a computerized police reporting system because the alleged

15

harm was not caused by the advertising act itself); *Mylan Labs., Inc. v. Am. Motorists Ins. Co.*, 226 W.Va. 307, 700 S.E.2d 518 (2010) (no advertising injury when insured issued publication to drug providers of the price spread in the wholesale price of generic drugs). *See generally* Advertising Injury Insurance, 98 A.L.R.5th 1 (2002) (collecting cases). Despite our study of the cases presented by the parties and our extensive independent research, we have found no case that addressed a suit to collect a fee for creative services or enforce an alleged joint venture, like this suit.

Although expressed in six counts, the crux of RMG's complaint is that Blackstone failed to accord RMG a share of profits or an equity interest in return for Gray's services as called for in an oral contract between them. As might be discerned from the above cases, this claim differs markedly from those that have been recognized as falling within advertising injury coverage. In *Bank of the West v. Superior Court*,[11] the "modern watershed case construing advertising injury coverage,"[12] the California Supreme Court observed that the causal connection requirement limits commercial general liability policies so that they do not encompass every claim related to an insured's business. This observation is instructive, and we agree with Insurers that the lack of causation is dispositive here.

RMG plainly alleged that Gray and Black formed an oral contract—that they mutually promised to perform their ends of the bargain. One of the aims of the enterprise

---

[11] 10 Cal. Rptr. 2d 538, 560, 833 P.2d 545, 553 (1992).

[12] Jeffrey W. Stempel, *Stempel on Insurance Contracts*, § 14.06[C], at 14-62.9§ (3d. ed., 2015 supp.).

was for Blackstone to use Gray's work in its advertisements. Given this agreement, it cannot be fairly said that RMG suffered injury from the use of advertising materials Gray willingly delivered to Blackstone for that purpose. The wrong RMG alleged was Blackstone's failure to pay RMG a percentage of profits and give it an equity stake in the venture involving the sale of Blackstone's product. The fallacy in Blackstone's current claim against Insurers is that Blackstone's use of RMG's creative ideas could only enhance RMG's claims for profits or an equity share, not injure him.

*Novell, Inc. v. Federal Insurance Company*, 141 F.3d 983 (10th Cir. 1998) is another example of an injury caused by a breach of contract and not by an advertisement. In *Novell, Inc.* the underlying claim against Novell was based on claims by Ross, the designer of certain software, that Novell violated its oral and written representations to the plaintiff that Novell would not "use, appropriate, or usurp ideas or concepts [developed by Ross] or do anything to compete with Ross." *Id.* at 985. The Tenth Circuit, applying Utah law, rejected Novell's claim of an advertising injury, reasoning:

> Here, Ross alleged Novell/WordPerfect, in direct violation of its own oral and written representations to Ross, misappropriated his product idea . . . and developed and marketed a competing produce . . . . Even if Novell/WordPerfect advertised or otherwise marketed [a competing product], the violations alleged by Ross were not the result of Novell/WordPerfect doing so. Rather, Ross was injured when Novel/WordPerfect created and sold a competing product in direct contravention of oral and written statements to him. The fact that it may have advertised the competing product to consumers simply did not cause Ross' injuries.

*Id.* at 988 (omissions added); *see also Microtec Research Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 971 (9th Cir. 1994) (harm was "caused by misappropriation of the [computer] code, not by the advertising itself").

Courts have rejected other entreaties by insureds to extend comprehensive general liability coverage to breach of contract claims, because that would fundamentally alter the nature of the insurance relationship and effectively render the insurer a surety. *See Fallon McElligott, Inc. v. Seaboard Sur. Co.*, 607 N.W.2d 801, 804 (Minn. Ct. App. 2000) ("Insurer protection of contractual performance is provided by performance bonds, by errors-and-omissions policies, by insurer guarantees of indemnification agreements or debt repayment, and some other types of policies. But [the insured's] enumerated-risks *liability* policy . . . was not such a policy.") (emphasis in original); *Structural Bldg. Prods. Corp. v Bus. Ins. Agency*, 281 A.D.2d 617, 619, 722 N.Y.S.2d 559, 562 (N.Y. App. Div. 2001) ("The general rule is that a commercial general liability insurance policy does not afford coverage for breach of contract, but rather for bodily injury and property damage. To hold otherwise would render an insurance carrier a surety for the performance of its insured's work." (citation omitted)). Although—unlike this case—the underlying suit against the insured in *Fallon McElligott* claimed professional negligence in addition to breach of contract, we still consider this case apropos.

Blackstone cannot expand the scope of its Policy simply by pointing to its "arising from" language. That language is intended to restrict, not expand, coverage. We find instructive the reasoning employed by the Minnesota Court of Appeals in *Fallon McElligott, Inc. v. Seaboard Surety Company*, *supra*. In that case, an advertising agency

18

"prepared for a client advertisements that copyright holders believed violated their copyrights." *Fallon McElligott*, 607 N.W.2d at 802. When its client sued for breach of contract and professional negligence, the advertising agency tendered the defense to its insurer, which denied coverage on the ground that it was beyond the scope of coverage. *Id.* The agency's insurance policy provided that the insurer would defend any suit seeking damages "resulting from . . . any infringement of copyright or of title or of slogan."[13] *Id.* at 803. The agency settled the claim and attempted to recover settlement and defense costs from its insurer. *Id.* at 802.

The court rejected the agency's arguments that the clause was implicated: "Because [the client's] underlying claim is grounded on [the agency's] failure to fulfill a contract obligation, it falls both outside the . . . policy insuring clause and within the exclusion for 'failure of performance of contract.'" *Id.* at 804. The court found unconvincing the insured's argument that the policy's "resulting from" language—similar to the "arising from" language found in Blackstone's Policy—extended coverage to the claim:

> [The insured] claims that the insuring clause (which covers "liability imposed upon" the advertising agency for "money damages resulting from * * * infringement of copyright") covers the [underlying] claim, arguing that the losses [its client] sought to recover through its claim of contract breach and professional negligence should be viewed as "resulting from" the copyright violation. [The insured] tries to accomplish too much with the two words "resulting from." The policy might well have used: "arising from," "following

---

[13] Similar to our case, the policy in *Fallon McElligott, Inc. v. Seaboard Surety Co.*, 607 N.W.2d 801, 803 (Minn. Ct. App. 2000) included a policy exclusion for breach of contract, which provided: "The Seaboard policy also specifically excludes claims for damages that arise from 'any liability for * * * failure of performance of contract * * * .'" The court did not, however, rely upon that clause in reaching its conclusion.

upon," "because of," or a myriad of other phrases to describe a relationship of causation. But no matter what phrase was used, the intent would not have been to cover losses based on a "but-for-the-insured's-conduct" standard.

*Id.* at 804–05. Similar to the sentiments articulated by other courts discussed *supra*, the Minnesota Court of Appeals expressed concern that a liberal interpretation of the term "resulting from" could drastically expand the scope of coverage beyond what was intended:

Insurance-industry scriveners would bear an unrealistic burden if an occasional phrase could convert a liability policy into a totally different type of policy. The policy in this case is—notwithstanding the "resulting from" phrase—still an enumerated-perils policy providing protection against liability claims, rather than coverage for a failure to perform a contract.

*Id.* at 805.

We agree with the Minnesota court. Advertising injury clauses do not extend to breach of contract claims, and the mere inclusion of the phrase "arising from" in the Policy does not expand the scope to contract claims that happen to have a relationship with advertisement activity. To do so would transform insurers into sureties and subvert advertising injury coverage. Our view is consonant with the intermediate appellate court's reasoning that contract-based claims do not meet the causal connection requirement because "the claims remained viable even if Blackstone had never used the disputed advertising ideas to sell its products." *Blackstone*, 216 Md. App. at 489, 88 A.3d at 803. Thus, we agree with the holding of the Court of Special Appeals that insurance coverage was not invoked by counts I, II, V, and VI.

**RMG's Unjust Enrichment Count**

20

We part company with the Court of Special Appeals, though, in its analysis of RMG's unjust enrichment claim, which is the only count given credence by the intermediate court.[14] In its decision to preserve Blackstone's insurance defense, it reasoned:

> RMG's remaining unjust enrichment claim *did,* however, depend on Blackstone's use of RMG's advertising ideas. **In that count, RMG alleged that Blackstone was unjustly enriched by retaining the benefit flowing from its use of RMG's ideas in advertisements for Blackstone's products.** The complaint's count for unjust enrichment therefore bore a "direct and substantial" relationship to the use of RMG's advertising ideas in Blackstone's advertisements, making that claim an "advertising injury" under the parties' insurance agreement.

*Id.* at 489–90, 88 A.3d at 803 (internal citation omitted) (emphasis added). We disagree because we see the same causation problem for the unjust enrichment count as we identified for the other counts.

Count III recites: "[RMG] conferred [a litany of] benefits upon Blackstone, with whom it had a confidential relationship." This count includes the same nucleus of factual allegations as was discussed *supra*: RMG's development of the brand name; creation of copy and graphics for sales sheets; development of packaging and marketing materials; and placement of a full page advertisement in an industry journal. The facts alleged merely reiterate those set forth in the Second Amended Complaint: Gray, on behalf of RMG, did creative work for Blackstone and did not receive the promised dividends.

---

[14] The Court of Special Appeals did not address count IV, the quantum meruit claim, but as will be evident *infra*, the analysis for this claim collapses into the unjust enrichment discussion.

21

We have described the core principle of unjust enrichment as follows:

> A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.

*Berry & Gould P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108 (2000) (citation omitted).

Unjust enrichment is a quasi-contract, a legal fiction we have described in earlier cases:

> An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing. An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men. Finally, significant to our analysis is the definition of a quasi-contract.[15] *Black's Law Dictionary* defines it as a
>
> > [l]egal fiction invented by common law courts to **permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise**. It is not based on intention or consent of the parties, but is founded on considerations of justice and equity, and on **doctrine of unjust enrichment**. It is not in fact a contract, but an obligation which the law creates in absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such

---

[15] A quasi-contract is a term of art often used interchangeably with the term contract "implied in law." *Corbin on Contracts*, § 1.20, at 62 (1993). Adding to the confusion, various courts and commentators have also substituted the word "restitution" for these terms. *Id.* at 63. "Unjust enrichment," when used in this context, is also "occasionally used as a synonym for restitution." *Id.* These are all distinct from what we have called an implied contract, which is often termed an "implied in fact" contract and often considered a subset of express contract. *Id.* at 62.

> circumstances that in equity and good conscience
> he ought not to retain it.

*Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94–95, 747 A.2d 600, 606 (2000) (emphasis added) (internal citations and quotation marks omitted); *see also Pettus v. McDonald*, 343 Ark. 507, 513, 36 S.W.3d 745, 749 (2001) ("[A]n implied-in-law contract is not even a contract at all, but an obligation imposed by law to do justice *even though no promise was ever made or intended*." (emphasis added) (citing Calamari & Perillo, *Contracts* § 1–12 (3d ed. 1987))).

Judge Moylan, writing for the Court of Special Appeals, also shed light on the nature of unjust enrichment:

> When we enter the world of restitutionary remedies, we have arrived in the land of unjust enrichment. The restitutionary remedies and unjust enrichment are simply flip sides of the same coin. The generative purpose of a restitutionary remedy is the prevention of unjust enrichment.

*Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 454, 843 A.2d 252, 275 (2004) ("*Alternatives*").

The intermediate court in *Alternatives* looked to several treatises, including George E. Palmer, *The Law of Restitution* (1978), which described the relationship of unjust enrichment to the universe of other "sources of liability":

> It has been traditional to regard tort and contract as the two principal sources of liability at common law, although liability arising out of a fiduciary relationship has developed largely outside these two great categories. There is another category that must be separated from all of these; this is liability based in unjust enrichment.

\* \* \*

23

> **Restitution based upon unjust enrichment cuts across many branches of the law, including contract, tort, and fiduciary relationship, but it also occupies much territory that is its sole preserve**.

*Id.* at 452–53, 843 A.2d at 274 (emphasis added) (quoting *The Law of Restitution*, § 1.1, at 1–2).

The *Alternatives* court also consulted the venerable treatise, Dan B. Dobbs, *Law of Remedies* (2d Ed. 1993) ("Dobbs"), which declared restitution to be a "'**simple word but a difficult subject, partly because restitutionary ideas appear in many guises**.'" *Alternatives*, 155 Md. App. at 455, 843 A.2d at 275 (emphasis added) (quoting Dobbs at 551–52). The treatise described the evolution of unjust enrichment claims, and how they "'went under a splendid variety of names like Money Had and Received, Money Paid, Money Lent, Quantum Meruit and many others,'" but "'are now perceived to be merely subsets of restitution. The modern view is that **unjust enrichment is a unifying principle for all such cases and restitution is the award made to . . . those that used to be brought in equity**.'" *Id.* at 454, 843 A.2d at 275 (emphasis and omission added) (quoting Dobbs at 564).

This bit of history regarding unjust enrichment confirms our sense that unjust enrichment is both elemental and elusive. Nevertheless, we can see clearly that the unjust enrichment claim asserted against Blackstone does not qualify as a suit invoking the "Advertising Injury Liability" under the Policy. We explain.

The allegations and cause of action in Count III are duplicative of RMG's Counts I and II—its breach of contract and promissory estoppel claims. As in those counts, the facts

24

alleged clearly reveal that RMG was not injured by the advertisements Blackstone published. RMG was allegedly injured by Blackstone's refusal to pay to RMG its share of the fruits of that advertising, *i.e.* profits. But the profits from the sale of Blackstone's product were *enhanced* by the advertising which was the subject of RMG's complaint.

Styling this count as "unjust enrichment" does not transform the nature of the injury. The measure of damages in an unjust enrichment claim is the value of the goods or services rendered by the plaintiff in the hands of the defendant. *See Mogavero v. Silverstein*, 142 Md. App. 259, 276, 790 A.2d 43, 53 (2002) ("Thus, the classic measurement of unjust enrichment damages is the gain to the defendant, not the loss by the plaintiff." (citation and internal quotation marks omitted)). This is the same measurement of damages that would apply in RMG's claims for breach of contract and promissory estoppel, which averred entitlement to a share of profits and an equity share in the joint venture, both of which were only enhanced by the advertising.

In sum, in all of the counts alleged by RMG, the advertising done by Blackstone using Gray's ideas was all for the positive—it enhanced the value of the profits and joint venture interest to which RMG claimed entitlement. The advertising, even though utilizing Gray's ideas, did not injure RMG. Unlike the majority of cases finding an advertising injury, it had no competing business. See, *e.g.*, *Letro Prods., Inc. v. Liberty Mut. Ins. Co.,* 114 F.3d 1194 (9th Cir. 1997) (advertising injury clause implicated when insured infringed upon competitor's products when using photographs of competitor's products in its promotional materials) and other cases cited, *supra*. Nor did it claim that it could profit

from a different use of those advertising ideas, which were specifically designed for Blackstone's product, "Vision Enhance."

## CONCLUSION

In conclusion, after reviewing the coverage and defenses under the Policy and the allegations in the underlying action, we hold that there was no potentiality of coverage. Blackstone did not show an advertising injury because none of the allegations of the underlying suit brought by RMG identified any injury that was caused by the advertisements created by RMG. Thus, Insurer had no duty to defend its insured. Accordingly, we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS TO BE PAID BY RESPONDENTS.**

Circuit Court for Baltimore County
Case No. 03-C-11-004834

Argued: February 5, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2014

_____

MARYLAND CASUALTY COMPANY, ET
AL.

v.

BLACKSTONE INTERNATIONAL LTD, ET
AL.

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Dissenting Opinion by Watts, J., which
Battaglia, J., joins

_____

Filed: April 21, 2015

Respectfully, I dissent. The Majority Opinion appears to assume, but not address, that product packaging can constitute "advertising" within the meaning of the Policy, and instead focuses on the "causal connection" requirement as determinative. I would hold that product packaging constitutes "advertising" as that term is defined in the insurance policy; and the issues as to policy exclusions were not preserved for appellate review. As such, I would affirm the judgment of the Court of Special Appeals.

Insurers contend that the Court of Special Appeals erred in concluding that a product's packaging was an "advertisement." According to Insurers, in interpreting the terms of the Policy, the Court of Special Appeals improperly substituted its own definition of relevant terms in place of the unambiguous definitions within the Policy. Blackstone responds that the Court of Special Appeals was correct in holding that a product's packaging fits within the Policy's definition of "advertisement[,]" and argues that nothing within the Policy's definition of "advertisement" excludes a product's packaging or a product's display from being an "advertisement." In Blackstone's view, the Policy's definition of "advertisement" focuses on the act of broadcasting or publishing to the general public. I agree with Blackstone.

In determining whether an insurer has a duty to defend an insured, the Court must engage in a two-part inquiry: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action [underlying action] potentially bring the tort claim within the policy's coverage?" Walk v. Hartford Cas. Ins. Co., 382 Md. 1, 15, 852 A.2d 98, 106 (2004) (citations omitted) (brackets in original). Thus, I would begin the analysis with the scope of coverage under the relevant

terms and provisions of the Policy.  See id. at 15, 852 A.2d at 106.  The "personal and advertising injury" provision of the Policy provides, in pertinent part:  "[Insurers] will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.  [Insurers] will have the right and duty to defend the insured against any 'suit' seeking those damages."  The Policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

In the complaint, RMG alleged that Blackstone sold the "Vision Enhance" product to Wal-Mart, which resold the product under its "Mainstays" label.  According to RMG, "some of the 'Mainstays' low vision lighting products actually include[d] the use of the 'Vision Enhance' name on the boxes, and use the same or substantially similar box design, copy on the box, and product instructions that are identical to the first 'Vision Enhance' product, that was created in substantial part by . . . RMG."  From my perspective, the initial inquiry is whether a product's packaging falls within the scope the Policy's definition of "advertisement."  I would hold that it does.

In examining the Policy's definition of "advertisement," I note that the terms used—specifically, "notice," "broadcast" and "published"—are exceptionally broad and are not defined within the Policy.  Impliedly, Insurers assert that "broadcast" and "published" should be strictly construed to encompass only traditional marketing mediums, such as

television, magazines, and internet.[1]  Such a constricting definition is not supported by the plain and common use of the terms.  Indeed, "broadcast" means "to make widely known," Broadcast, Merriam-Webster, http://www.merriam-webster.com/dictionary/broadcast, and "publish" means "to make generally known" or "to disseminate to the public," Publish, Merriam-Webster, http://www.merriam-webster.com/dictionary/publish.   Under these broad definitions, it can fairly be said that a product's packaging "disseminates" or "makes known" to the public information about a product or good.[2]

Having determined that product packaging falls within the Policy's definitional scope of "advertisement," I would next consider whether RMG's allegations trigger coverage under the Policy.  See Walk, 382 Md. at 15, 852 A.2d at 106.  "Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy."  Id. at 16, 852 A.2d at 106 (emphasis in original).  This inquiry, of necessity, involves consideration of whether the allegations of RMG's complaint demonstrate that RMG claimed an "advertising injury" as that term is defined in the Policy.  See id. at 16, 852 A.2d at 107 ("Under the terms of the Policy, [insurer] had a duty to defend [insured] only if the [underlying] complaint and the extrinsic evidence claim an

---

[1]It should be noted that Insurers do not contend that a product's packaging is not a "notice" within the scope of "advertisement."

[2]Insurers cite numerous cases from other jurisdictions to support its position that a product's packaging cannot constitute "advertising."  Insurers' reliance on these cases is misplaced, as the other jurisdictions' courts held that a product itself, not a product's packaging, cannot be considered "advertising."  See, e.g., Krueger Int'l, Inc. v. Fed. Ins. Co., 647 F.Supp.2d 1024, 1035 (E.D. Wis. 2009).

'advertising injury.'"). Here, in agreement with the Court of Special Appeals, I would conclude that RMG's allegations of unjust enrichment, which specifically refer to the "Vision Enhance" name, box design, copy, and product instructions, sufficiently alleged an "advertising injury" and thus could **potentially** be covered under the Policy; thus, I would resolve the duty to defend in Blackstone's favor. I explain.

In the complaint, in the claim for unjust enrichment, RMG alleged that Blackstone was unjustly enriched because it "continues to retain the benefit conferred upon it by Plaintiff through, in part, its **use** of concepts, expert evaluations, 'Vision Enhance' brand name and packaging, all of which were developed by Plaintiff or with Plaintiff's assistance." (Emphasis added). Under the clear terms of the Policy, an "advertising injury" "means injury . . . arising out of one or more of the following offenses: . . . [t]he use of another's advertising idea in your 'advertisement'; or [i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'." (Paragraph breaks omitted). In my view, RMG's unjust enrichment claim alleged that it was injured by Blackstone's use of RMG's ideas in advertisements for Blackstone's product, thus bringing it within the definition of "advertising injury" under the terms of the Policy. In other words, the unjust enrichment claim did, indeed, allege an advertising injury resulting from Blackstone's use of RMG's advertising ideas in its advertisements. Having determined that the coverage and requirements of the Policy include a product's packaging as advertising and that the allegations of RMG's complaint potentially brings the claim for unjust enrichment within

the Policy's coverage, I would conclude that Insurers had a duty to defend.[3]

The Majority also does not address the issues of preservation and waiver. Blackstone asserts that Insurers waived all defenses, including Policy exclusions, that it did not raise in the circuit court.

Maryland Rule 8-131(a) provides, in pertinent part: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised

---

[3]The Majority relies on language from Walk, 382 Md. at 17, 852 A.2d at 107, for the proposition that three requirements must be satisfied to constitute an advertising injury: "The policy requires that the underlying plaintiffs allege the potential for three things: (1) an 'advertisement'; (2) an 'advertising injury,' which entails the copying of an advertising idea or style into an advertisement; and (3) a causal relationship between the advertising injury and the alleged damages." Significantly, in Walk, id. at 17, 852 A.2d at 107, the three requirements were specifically limited to the insurance policy at issue. Moreover, in Walk, the only discussion of a causal relationship is in the above-quoted language. In Walk, the large part of the analysis concerned only whether the insured demonstrated that the underlying complaint alleged an advertising injury, and concluded that the insured did not show the allegation of an advertising injury either in the complaint or through extrinsic evidence; i.e., additional discussion of a causal relationship is not included in the case and the causal relationship prong is not applied. See id. at 17-24, 852 A.2d at 107-11. And, aside from Walk, the Majority relies on no other Maryland case discussing or applying the causal relationship requirement, and instead cites to cases from other jurisdictions as well as a treatise. See Maj. Slip Op. at 13-16. In my view, Maryland case law requires only that a court engage in the two-part inquiry set forth above—(1) what is the coverage and defenses under the terms and requirements of the policy and (2) do the allegations of the underlying complaint potentially bring the claim within the policy's coverage. Thus, examining solely whether a causal connection exists is not consistent with Maryland case law. In any event, in this case, I agree with the Court of Special Appeals that determination of whether an "advertising injury" was alleged in RMG's complaint subsumes the discussion of causation. See Blackstone Int'l Ltd. v. Md. Cas. Co., 216 Md. App. 471, 481 n.6, 88 A.3d 792, 798 n.6 (2014). By the terms of the Policy, a determination that an advertising injury was alleged necessarily involves a causation analysis and the determination that the injury alleged "arise[s] out of one or more of the following offenses: . . . [t]he use of another's advertising idea in your 'advertisement'"; i.e., one must determine that RMG's claims "arise[] out of" the use of RMG's advertising ideas in Blackstone's advertisements, a causation analysis.

in or decided by the trial court[.]" Appellate review of a grant of summary judgment must be "confined to the basis relied on by the trial court." Sadler v. Dimensions Healthcare Corp., 378 Md. 509, 536, 836 A.2d 655, 671 (2003).

At bottom, Insurers contend that they did not have a duty to defend Blackstone against RMG's suit. To support this position, Insurers, both in their pleadings and during the hearing on the motion for summary judgment before the circuit court, relied exclusively on the argument that RMG's claims did not fall within the scope of an "advertising injury" as defined under the Policy. Indeed, in a statement of undisputed facts, Insurers emphasized that, in addressing "whether coverage exists under the insuring agreement of the policy[, they have] not relied on the breach of contract exclusion." Moreover, during his argument before the circuit court, Insurers' counsel stated:

> [I]t's clear on the face of [RMG's] second amended complaint that the allegations don't come within the [P]olicy['s] coverage[]. But even if Blackstone could get over that hurdle, then we do look down to the . . . exclusions. And there are two relevant exclusions in this case. . . . [A]nd there's a very clear reason why [Insurers] didn't put [the exclusions] in the litigation at this point. . . . If we go down to the exclusion, it becomes [the Insurers'] burden [of proof]. It makes it harder to deal with on summary judgment[,] and so we decided not to include it.

The Court of Special Appeals held that Insurers affirmatively "waived" an exclusion-based defense to the denial of coverage that was not raised or addressed in filings or at the hearing. See Blackstone Int'l Ltd. v. Md. Cas. Co., 216 Md. App. 471, 486, 88 A.3d 792, 801 (2014). I agree with this characterization of Insurers' procedural posture before the circuit court, and would conclude that the issue of an exclusion-based defense to the denial of coverage was not raised or addressed by Insurers in the circuit court such

that they could raise the issue on appeal.  See Md. R. 8-131(a).[4]

For the above reasons, respectfully, I dissent and would affirm the judgment of the

Court of Special Appeals.

Judge Battaglia has authorized me to state that she joins in this opinion.

---

[4]Although the Majority asserts that it does not rely on the provision of the Policy excluding breach of contract actions from coverage as an "advertising injury," see Maj. Slip Op. at 12 n.10, the Majority discusses breach of contract actions exclusions and concludes that "[a]dvertising injury clauses do not extend to breach of contract claims, and the mere inclusion of the phrase 'arising from' in the Policy does not expand the scope to contract claims that happen to have a relationship with advertisement activity[,]" Maj. Slip Op. at 20.  The Majority later concludes that RMG's unjust enrichment claim is duplicative of its breach of contract and promissory estoppel claims.  See Maj. Slip Op. at 24.  Thus, in my view, whether Insurers waived or failed to preserve the Policy's exclusions, including the breach of contract actions exclusion, should have been addressed on the merits.